This is Enese Simon v. Healthsouth Corporation. Robert Magnanini is here for Appellant Simon. Matthew Howard-Lemke is here for the Affili Healthsouth. And Mr. Magnanini, you may begin when you're ready. Thank you, Your Honor. May it please the Court, Bob Magnanini from the law firm of Stone & Magnanini in Berkeley Heights, New Jersey, for the Appellant's M.C. Simon and her billing company, Florida Rehabilitation. Your Honors, we're here on two issues. We believe the District Court erred in finding that Dr. Simon did not show that it was objectively reasonable that she believed that Healthsouth was submitting false claims based on a made-up diagnosis of disuse myopathy because she had no actual knowledge of billing for individual patients. And we also believe the District Court erred in applying the Court's September 19, 1919 Sarah Care opinion that doctors could not prove an objective belief where physicians differed on the legitimacy of a diagnosis of disuse myopathy. Your Honor, in a nutshell, our argument is that Dr. Simon verbally complained when she was briefed on this new diagnosis called disuse myopathy. And then she verbally complained to the prior president and then the new CEO, Mr. Braz, after Mr. Epley, the prior CEO, had passed away. And we also had testimony that at the presentation of disuse myopathy, another doctor, Dr. Youm, complained about the disuse myopathy, having never heard of it in all of his years of practice. So Ms. Billa Lobos, who came from Healthsouth to give the presentation, testified that no one complained. So we have an issue of fact there. Dr. DeJesus. I'm going to ask you just a question out of the gate. First, you're saying disuse myopathy. If I say DM, you understand what I mean. As I understand it, Ms. Simon diagnosed patients with DM for several months. Were her diagnoses false or fraudulent? There's actually some dispute about that, Your Honor. Dr. Simon testified that some of the patients she had were admitted at different times. And what the doctors would do, they would all work during the week, but they would take turns covering for each other on the weekend. So there was some testimony from Dr. Simon that the patients may have been admitted on a weekend that Dr. Youm was covering for her and were not initially diagnosed by disuse myopathy. She testified that she also believed that if the patient had disuse myopathy, there were other reasons that they should be admitted, including gait dysfunction or things like that. Her concern was, and she also testified, she felt pressure to use disuse myopathy from the people within HealthSouth. Is it clear that we have at least one patient that she has diagnosed with DM? I think we could agree to that, Your Honor. Was that diagnosis false or fraudulent? I believe she said it was not because there were other diagnoses. But she said once she had asked, I guess after Ms. Bilobos gave the presentation, she had asked Ms. Bilobos, what are we going to do with this? And Ms. Bilobos said, disuse myopathy can be billed to CMS under a code under ICD-359-89. Myopathy is not elsewhere classified. So Dr. Simon knew it was going to be billed, and then she said, what kind of information do you have to back up disuse myopathy? And a number of doctors asked for that information. It was never provided. So they said if we had used disuse myopathy, we stopped using it. Dr. Simon also testified, I believe it was August or September of 2010, she attended the American Medical Rehabilitation and Physicians Conference in Atlanta and spoke to doctors outside of HealthSouth about disuse myopathy. And they all said they had never heard of it in their experience. Okay. But I want to go back to my specific question. So you're not telling me that her use of the DM was false or fraudulent, that there may have been other, when she did this diagnosis, there may have been other supporting diagnoses. Why then, if we look at the other doctors who are also diagnosing with DM, how do you get to the fact that her belief of fraud being submitted to the U.S. government is reasonable if, why aren't the other doctors saying that's exactly what happened? It wasn't billed improperly. If I did diagnose with DM, there was no improper billing. How do you get to that point? Your Honor, I believe we included a document in the appendix. It's 221-4. And what that is, it was attached to a series of emails from Dr. Clohan, who is the medical director for HealthSouth. And she asked, she talks about disuse myopathy as a product and the difficulty of getting it accepted throughout HealthSouth. And in that spreadsheet that HealthSouth provided between September of 2009 and August 31st of 2010, you can see disuse myopathy used in a wide range throughout HealthSouth facilities. In Western Hills, it was used for 50.8% of admissions were based on disuse myopathy. There were 16 facilities, IRF facilities, that never used disuse myopathy at all. And there were another 20 facilities, including Sarasota, where Drs. Simon and Dr. Youman DeJesus were, where it's used less than 1% of the time. So it seemed, and one of the precursors to the use of disuse myopathy was the need for the IRF facility to meet the 60% requirement of the CMS-13 categories. If you didn't meet that category, you were not classified as an IRF, and you could not receive the 2.5 times reimbursement. So when Linda Wilder, who was a VP for HealthSouth, went to Sarasota, she came away with a belief that they were at 64%, well over the 60% needed to retain their IRF status. In fact, what happened when she went back to headquarters was she found out it was 54%. At that point, she said, we have to dispatch Ms. Billa Lobos to go to Sarasota, train the business liaisons who brought the bodies into the facility, and get them to say, if you can't find another CMS-13 category, write DM. And she actually gave a slideshow to the business liaisons on how to convince your doctor to accept DM as a diagnosis. It's not evidence of fraud merely because doctors are talking about how to meet a 60% threshold. For example, if stroke was a code that got you to the 60% threshold, telling your doctors, hey, be aware, this is a code that can get you to that threshold. If you have a patient who suffered a stroke and has other symptoms, make sure to code it for stroke. That, in and of itself, is not fraud. That's definitely correct, Your Honor. What the problem Dr. Simon had and other doctors had with disuse myopathy was it was kind of a fill-in. It hadn't existed in the literature. Even HealthSouth's expert, Dr. Bradom, who had published six treatises on physiatry, never mentions disuse myopathy. So what it was being presented as, if you can't fit it in these other 13 categories like stroke, hip replacement, spinal cord injury, brain injury, things like that, you could get in as a myopathy of general muscle weakness, just not elsewhere classified. But some doctors have embraced the diagnosis. So why is this not just a difference of opinion? Well, Your Honor, when questioned, the two doctors I can talk about besides Dr. Simon I know were the federal government. Dr. Simon had filed the first False Claims Act case against HealthSouth based on disuse myopathy on February 3, 2012. The two doctors who also used disuse myopathy within the Sarasota facility, Dr. DeJesus and Dr. Youm, after they were questioned by the U.S. government, both said they stopped using it. So if it was a legitimate diagnosis, why wouldn't they keep using it? And when you look at the ICD code book, it contains codes on everything. There's a code on being... Well, it could also be that they wanted to keep getting patients from HealthSouth. That could be, Your Honor. And there was an investigation going on. And Dr. Youm especially said he felt personally responsible for having utilized disuse myopathy and kind of brought this whole investigation down on HealthSouth. But what we were getting at, Your Honor, was Dr. Simon listened to it, never got the supporting documentation, may have used it, may not have used it, stopped using it, complained about it, filed a lawsuit showing that objectively she thought false claims were being filed against the government. And when the government intervened, Your Honor, you know in False Claims Act cases, the Department of Justice has to have a client. The client in this case was CMS. It was the entity that had been paying HealthSouth for submissions under this 359.89 myopathy not elsewhere classified. And clarify something for me. The False Claims Act cases did not just involve DM. There were other practices that were being challenged. There were two other ones, Your Honor. One critical illness myopathy and another neuropathy. And actually both are in the chart that we included in there. But disuse myopathy, this disuse myopathy was the one that was focused on because again it did not have any predecessor or precursor and it was invented, we believe, by the doctors in Western Hills because they needed, like I said, 50% of their admits were based on a 60% level. Your Honor, in my last minute, I think the three things to concentrate on was, as I said, in March of 2010, Ms. Bill Alobos went and gave this presentation on disuse myopathy. In July of 2010, Mr. Braz became the CEO. And on October 18th of 2010, in what we've included is document 217-4, Ms. Arnold, who was the marketing director, wrote to Mr. Braz and said, I spoke to the admission liaisons today regarding the unassigned patient rotation. Please let me know when you have communicated the procedure to Dr. Simon and we will implement a new process. Mr. Braz is obviously upset and writes back, what exactly did you communicate? I didn't want any communications to occur as discussed until I have more information. Ms. Arnold apologizes. And what we believe that shows is an effort at that point to punish Dr. Simon for not going along with disuse myopathy. She was being shunned at work. No one would talk to her. This was a way to strip the patients from her. Without patients, she's got no way to make a living at HealthSouth Sarasota. And what Dr. Simon did was both go talk to counsel about filing a case. She tried to get new work and went to the competitor, Sarasota Memorial, and the doctor there told her, we don't want you to bring over the fraud that's occurring at HealthSouth. So she was allowed to treat one patient, then allowed to work weekends, and then allowed to finally get a job, and she's got another job in Maine. We believe that that email shows that all of this defense is raised by HealthSouth were pretextual. Thank you, Your Honor. Let me ask you a question. Sure thing. Before you sit down. These briefs are mighty long. Are you sure they comply with Rule 32? It can't exceed 30 pages. They're more than twice the 30 pages. It can't be more than 13,000 words. I haven't had my law clerks count the words, but . . . We . . . These are both sides. These are some pretty long briefs for the issues that we have in this case. You're right, Your Honor. They are, but I believe what we did, my co-counsel actually filed it, was that they ran it through the word count system, and it met the requirements for the word count in the font that it's presented. I believe it's 14.5. Sixty-two pages for one of these briefs, 58 for the other, and you sure it meets the requirements of Rule 32? I made sure. I went over this with them a number of times, Your Honor. I wasn't going to come here and have you tear the back of my brief off and say we're not going to consider it. We definitely try to comply. All right. Thank you, Mr. Magnanian. Thank you, Your Honor. We'll hear from Mr. Lemke. May it please the Court, I'm Matt Lemke, and along with Stanley Blackman, I represent the HealthSouth parties. Judge Branch, I want to respond to your questions about the difference of opinion on these diagnoses and the connection between that to this court's ACERICARE precedent. First of all, in terms of what Dr. Simon was doing, the record shows she was using the disused myopathy diagnosis as many as eight months later, even after the alleged retaliatory conduct had occurred. In the record, it shows she was still diagnosing patients with this in November. She was pressured to do so. Your Honor . . . Then when she filed the lawsuit, then they stopped sending her patients. Your Honor, they didn't know about the lawsuit. It was filed under seal. I think she filed an under seal lawsuit, and she certainly hadn't even filed the lawsuit in November of 2010. Wasn't there a plaintiff in the case? Sir? Wasn't there a plaintiff in that case, in the lawsuit? She was, but she didn't file the lawsuit until 2012, and it was filed under seal. My point is, she says, you heard Mr. Magnanini make the comment that she allegedly attended the meeting and then wasn't satisfied and didn't use it anymore. Well, eight months later, she was still using it, but even more importantly, in response to the statement of undisputed facts in the motion for summary judgment . . . That's all part of her argument, that we were pressured. We were pressured to diagnose patients with DM, so that HealthSouth could get higher rates. Well, Your Honor . . . I mean, if she was pressured like others were, I mean, you settled the case for $48 million. Your Honor, we did not settle the retaliation claims, and . . . I'm talking about the retaliation claims. Of course, the . . . I'm talking about the False Claims Act. Can you settle it for $48 million? Your Honor, there was a settlement of that and six other cases on a nationwide basis in which Dr. Simon agreed there was no admission of liability of any kind. I don't think in any way that settlement can make up for the deficiencies in her proof in making out her prima facie case. This is a retaliation claim, and all she has to demonstrate to a jury in order to recover is that she had a reasonably objective belief that HealthSouth was submitting false claims to the government. Why couldn't the jury look at the fact she hired a lawyer, they filed a lawsuit, you settled the case for $48 million, and there's no medical literature describing disuse of myopathy as a legitimate diagnosis? Jury can't look at that and say, well, she had an objectively reasonable belief? No, sir. The jury is never going to hear about the settlement, so obviously, she can't get past summary judgment based on evidence that the jury's never going to hear. Number one. How do we know the jury isn't going to hear that? Under this court's Morrissey opinion, which was applying Rule 408, that would be using it to establish liability, which is prohibited. It's later for the district judge in the case to decide whether or not that's admissible at a trial, right? You can't survive summary judgment based on inadmissible evidence. There's no way . . . Your Honor, let me focus in more on the assertion that under ACERICARE, if two doctors in their clinical judgment can have differing views on the propriety of a diagnosis, then it can't be a false claim. That's not a retaliation case. No, but this court . . . This is a retaliation case. I understand, Your Honor, but this court has said you have to assess subjective reasonableness of her belief against the existing backdrop of the substantive law, and the substantive law in this circuit about a false claim in the context of a medical judgment type situation is ACERICARE. You had Dr. Hume and Dr. DeJesus both say they researched this used myopathy and said they believed it was legitimate. She said . . . The issue in a retaliation case is whether she had an objectively reasonable belief. No, sir. The question is whether . . . Well, it's whether she had the subjective belief and was her belief objectively reasonable. If in this circuit, a reasonable difference of opinion among doctors means you can't have a reasonable belief that something is a false claim based upon that difference in diagnosis, and I would point . . . The record shows that she was questioned about a patient that Dr. Hume had diagnosed with disused myopathy, and she was asked . . . This is at document 210.315 to 316. She was asked, well, do you disagree with his opinion? She agreed that every physician could have a different opinion, and in response to the statement of undisputed facts, she admitted that in some circumstances disused myopathy can be a legitimate diagnosis, so this notion that . . . Weren't there other health self-physicians who have testimony in this record that they'd never heard of this disease, disused myopathy, until HealthSouth presented it to them? Yes, Your Honor, and that's just part of the reasonable difference of opinion on the diagnosis, but Acericare left a tiny crack to say if they brought in expert evidence to show that no physician could reasonably believe it to be a legitimate diagnosis, that might have been okay, but they didn't have that evidence. The only person . . . All they had was a difference of opinion, and Dr. Simon herself conceding that it could be . . . I understand your point, but the issue for the jury is whether or not she had an objectively reasonable belief that the HealthSouth was submitting fraudulent claims to the government, and she says, ladies and gentlemen of the jury, the basis for my belief is that there's no medical literature about this diagnosis at all. Several HealthSouth physicians say it's not a valid one. We were pressured. There were seminars pressuring us to submit this disease so that HealthSouth could get higher rates. You can't rely on that testimony to say, I was retaliated against. That sounds an awful lot like the Acericare situation where some doctors . . . Which is not a retaliation case. But it forms a substantive backdrop, but let me turn to a different element that I think may be a clearer path, in your view, to affirmance of this order, and that's the knowledge element. What she has to show is the second element is that the decision maker at HealthSouth, here Mr. Braz, had knowledge of her exercise of protected activity. Her exercise of protected activity was her purported statement at the March 2010 meeting that I don't think disuse myopathy is legitimate. Mr. Braz never arrived on the scene at the facility until four months later. These are good arguments that you can present to the jury to show that she did not have an objectively reasonable belief. This is a separate element, your honor. The objectively reasonable belief goes to the first element of whether she was exercising protected activity. The second element, which the district court didn't reach but is supported by the record, is she has to show that Mr. Braz had knowledge of her statement and was retaliating against her for that. This court has said it's a common sense view that you can't be retaliating against someone for something you didn't know. At page 22 and 23 of their reply brief, their only response to that is to say, well, you can impute the knowledge of others to her or to Mr. Braz for purposes of his knowledge for purposes of retaliation. That's their only response on the knowledge element. The problem is that runs headlong into this court's clear precedent that you can't use imputed knowledge to establish knowledge in the context of retaliation. That's the Krutzig case. Did the district court say this in its summary judgment order? No. The district court went only to the first element, your honor, but this is supported by the record on the second element. It seems to me that that would be later. Your honor, we move for summary judgment. They were obligated to come forward with evidence to show that they had met their burden to show that Mr. Braz had knowledge. They had an absolute failure of proof. Their only argument now is to say you can impute knowledge. Imputed knowledge is not allowed under this court's Krutzig opinion. That is an additional ground for summary judgment supported by the record. This court, under the DeNovo standard, should reach that and typically does reach alternative grounds. What's the reason now why HealthSouth stopped sending her patients? Your honor, HealthSouth clearly met its exceedingly light burden to establish a legitimate non-retaliatory reason. That is that she submitted a physical examination report on a patient that not only did she never examine, the patient wasn't even at the hospital. One time? Sir? That's one time and that's it? In addition, they also determined that she was not submitting her progress notes consistent with the applicable rules and . . . The timing seems mighty coincidental. Your honor, she admits she did it. There were no other problems with her at all. She had good performance evaluations. Your honor, the burden . . . Didn't she have great performance evaluations? No other problems? One time she didn't see a patient and she submitted it in an H&P without seeing the patient. Your honor, as the head of the Medical Executive Committee said, it is unethical for a doctor to complete a report on a patient she never saw. She admitted she did it and the Medical Executive Committee investigated it and agreed it was an error. During the time period that she was not being assigned patients, patient outcomes and complaint . . . patient outcomes improved, complaints went down. That clearly is enough to establish a legitimate non-retaliatory reason. If that's . . . In any event, the district court didn't reach the alternative ground, right? The district court did not reach the second and third element, but you certainly can under clear, settled precedent in this court. I don't think you're going to have to get there. She couldn't argue that that reason for not sending me patients, that one time I submitted a report in H&P for a patient that I didn't see, she could not . . . seems like a pretty minor and inconsequential reason for not sending me any more patients. She can't make that argument to a jury? No, sir, your honor. She did not meet her burden of showing pretext under this court's precedence because her primary response was that the comparators, there were other doctors who did the same thing, but they have to be identical in all material respects and the evidence was clear that they weren't identical in all material respects and Mr. Braz wasn't the decision maker in those situations, so that doesn't get her there. The district court never got to that, though? The district court never got to it, but there's a fully developed summary judgment record. She says others did the same thing? She did, but the evidence does not support that. There's a fully developed summary judgment record on this. You pointed out the differences between the comparators. None of the comparators had committed this offense . . . That's correct. . . . of filling out the paperwork before that patient had been seen. That is correct, Judge Branch, and there was no indication that Mr. Braz had been the decision maker and for it to be a true comparator, it not only has to be the same exact conduct, but it also has to be the same exact decision maker. There was no temporal proximity is what you're arguing between the . . . well, between her complaint about disuse myopathy and the change in patient reassignment. Well, that's exactly right. A critical . . . What's the gap between this, the writing up the patient before she'd seen it and was that . . . that's a quick turnaround from when the . . . She . . . they discovered that she did it on October 25th. She did not say anything to anyone for the three days when she was confronted in the hospital by someone saying, we have an H&P on a patient who's not here. She said, oh, I was meaning to let you know I need to pull that back. There was then an investigation, I think it was October the 29th, she was interviewed. November 1st, the decision was relayed to her, so it was very quickly thereafter. What Dr. Simon pointed to a minute ago was there was an email exchange between Mr. Braz and Arnold about the change in . . . a potential change in the assignment process, but that, if you look at it, it says nothing about taking patients away from her. The evidence shows Mr. Braz, when he came to the facility, unlike this one where they assigned him geographically, he had assigned it in a rotation basis, and so he was taking a look at that. The answer is, it was quick. They found out about the H&P problem, they immediately took action. The medical executive committee evaluated it. She allegedly complained about the disuse myopathy diagnosis way back in November. Under this circuit's precedent where three months is too much, that's way beyond it to create any sort of benefit. We think the district court can certainly be affirmed under a sericare and just on the failure of proof on the objective reasonableness prong, but she also has insurmountable problems on knowledge as well as on the causation elements as well. We ask that the district court be affirmed. Thank you, Mr. Lemke. Mr. Magnanini, you've reserved some time. Yes, Your Honor, three minutes. Your Honor, picking up on the temporal question from Judge Branch, as I was saying, the thing that happens here is March of 2010, this briefing occurs from HealthSouth Corporate on disuse myopathy. There's questions back and forth. Mr. Braz doesn't become CEO until July, when Dr. Simon at that point testified she had complained to the prior CEO, Mr. Epley, about disuse myopathy. She also testified, I believe, that she complained to Mr. Braz about the use of disuse myopathy. The email that we're discussing is dated October 18th of 2010. So Mr. Braz has been in power for just about three months, and he's decided he needs to do something about Dr. Simon. This email comes in, and it's sent from Ms. Ornell to Mr. Braz, and it refers to discussions that had already happened either a week or two before. So sometime in the middle or beginning of October, Mr. Braz is talking about stripping Dr. Simon of her patience. So we believe that Dr. Simon went to this American Academy meeting in Atlanta, complained to Mr. Braz. Mr. Braz, of course, denies it. So we have another factual dispute. And then as a result, they decide to strip these patients and get rid of her. As we said, it's a multi-pronged effort. They don't speak to her. They shun her. She ends up— When was the Atlanta meeting? I believe it was either August or September of 2010, Your Honor. And so then we get this email from Ms. Ornell saying, we're going to strip away these—we're going to change how we give out patients. We'll strip them from Dr. Simon. Dr. Simon was also forced to, by Mr. Braz, because of this note she dictated, and she tried to pull it back. She didn't hide it. She called them and said, I dictated something in error. I didn't see the patient. Can I take it back? And they told her no. Now Dr. Youm testified when he made errors, he would call up and they'd let him just change it on the dictation. Dr. Simon, they made her print it and sign it. And that became the basis for this MEC inquiry. The curators that she advanced had not done what she had done, which was doing the write-up for a patient that they had not yet seen. Right. Dr. DeJesus testified later that he had actually seen a patient somewhere else and wrote them up, but then they didn't come to the hospital for X amount of days. The interesting thing, though, Your Honor, was when I deposed Mr. Braz, I asked him, did HealthSouth Sarasota ever open up a file on a patient who'd never arrived? And he said, we had. I said, prior to Dr. Simon drafting up this note, he said, we had. And I said, had HealthSouth ever billed those patients for services even though they weren't there? And he said, we had, both prior to Dr. Simon's note and subsequently. And I asked him, how many MEC investigations were begun on that? And he said, none. And I asked him- But it would be dispositive, depending upon who the decision-maker was at the time. If that was a different supervisor back in the day when those were done, it would matter that we have a different supervisor now, correct? Yes, Your Honor, except that Mr. Braz also testified that these events occurred after the Dr. Simon note. So he was the supervisor, but he said there was no MEC investigation. No other doctors were forced to get letters from other referring physicians in order to see patients or have patients assigned to them. And the result of the MEC investigation was it was an isolated incident. And Your Honor, Judge Wilson, I just wanted to point out that we think the Hickman case, which is a retaliation case that the circuit decided January 9th of 21, about 18 months after a sericare, it never mentions a sericare. You need to go back to those, I think, that case. And that's completely different because there were no false claims were in the MEC. Here, Dr. Simon filed a false claims act case that led to a $48 million settlement. That's all I have, Your Honors. All right. Thank you. Thank you. The court is in recess until 9 o'clock tomorrow morning.